IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

Steven C. Lefemine, d/b/a Columbia )
Christians for Life, )
                                   )
                         Plaintiff, )       C.A. No. 8:08-3638-HMH
                                   )
                 vs. )       **OPINION & ORDER**
                                   )
Tony Davis, Sheriff, in his official capacity; )
Dan Wideman, individually and in his )
official capacity; Mike Frederick, )
individually and in his official capacity; )
Lonnie Smith, individually and in his )
official capacity; Brandon Strickland, )
individually and in his official capacity, )
                                   )
                         Defendants. )

This matter is before the court on the parties' cross motions for summary judgment. For the reasons set forth below, the court grants in part and denies in part Plaintiff's motion for summary judgment and grants in part and denies in part Defendants' motions for summary judgment.

**I. Factual and Procedural Background**

This matter arises out of an incident that occurred on November 3, 2005, in Greenwood County, South Carolina. (Am. Compl. ¶ 23.) Plaintiff, Steven C. Lefemine, is the sole proprietor of Columbia Christians for Life ("CCL"), an organization that "actively seeks to raise public awareness of the horrors of abortion throughout the State of South Carolina." (Id. ¶ 17.) In order to fulfill CCL's mission, Plaintiff "and other like-minded persons, preach and carry signs" which "depict aborted babies in order to shock the consciences of those who see

1

the signs to the horror of abortion." (Id. ¶¶ 19-20.) On "Thursday, November 3, 2005 at approximately 3:45 p.m., [] [Plaintiff] and about twenty other individuals began to establish a Christian pro-life witness" in Greenwood County, South Carolina. (Id. ¶ 23.) Specifically, the demonstration took place at the intersection of U.S. Highway 25 North and the S.C. 72 Bypass ("the intersection") which is "the busiest intersection in [Greenwood] County." (Defs. Mem. Supp. Summ. J. Attach. 6 (Mike Frederick ("Chief Deputy Frederick") Dep. 16).)

During the demonstration, Major Lonnie Smith ("Major Smith") received a telephone call from Lieutenant Randy Miles ("Lt. Miles") notifying him of complaints that had been received from motorists driving near the intersection. (Id. Attach. 8 (Major Smith Dep. 15).) In particular, Major Smith was informed that protestors were in the roadway holding graphic signs and one mother called saying that her son "was in the back seat screaming, crying because [he] had seen those signs." (Id. Attach. 8 (Major Smith Dep. 17).) Major Smith proceeded to the intersection to investigate. Deputy Brandon Strickland ("Deputy Strickland") also proceeded to the intersection to serve as backup after hearing of the complaints over the dispatch. (Id. Attach. 9 (Deputy Strickland Dep. 17).)

Prior to Major Smith or Deputy Strickland's arrival at the intersection, Lt. Miles informed Plaintiff that he "had several complaints about the graphic photographs and this was causing a disturbance in the traffic flow at th[e] intersection." (Id. Attach. 2 (Incident Report).) When Major Smith arrived at the intersection, he observed a number of individuals holding signs and megaphones. (Defs. Mem. Supp. Summ. J. Attach. 8 (Major Smith Dep. 21-22).) Major Smith requested that Deputy Strickland take multiple pictures of the scene. Prior to approaching the CCL members, Major Smith called Chief Deputy Frederick to report the events occurring at the

intersection. (Id. Attach. 8 (Major Smith Dep. 22)).) According to Major Smith, Chief Deputy Frederick informed him that "if we were getting complaints and these signs are graphic and people in the community were complaining, then we were to tell [them] that they could continue to protest but they would either have to put away or take down the signs or . . . possibly be ticketed for breach of peace." (Id. Attach. 8 (Major Smith Dep. 22)).)

Major Smith then approached Plaintiff and the following conversation ensued, in part:

**Major Smith**: How are you doing, sir?

**Lefemine**: Alright, sir, how are you?

**Major Smith**: Lonnie Smith with Greenwood County Sheriff's Office.

**Lefemine**: Steve Lefemine.

**Major Smith**: OK, we have a number of complaints from people that find this offensive and . . . they don't want this on the street. So, at this time, I'm gonna ask you to put them up, OK? Put these signs up, because you can't distinguish what age of people are seein' these signs. OK, I'm asking you to put 'em up and go ahead, and if you want to stand out here on the corner, that's fine, but we cannot have these signs up because people do consider this is offensive material. OK?

**Lefemine**: Major Smith, if you're ordering us to leave under threat of arrest or being ticketed, we will leave, but I want you to know you're violating our constitutional right [**Major Smith**: OK] because you're discriminating based upon content of our signs.

**Major Smith**: Right, people do find this offensive, and this is an offensive manner, OK? This is offensive because you've got small children–you've got different ones that are seeing this. We have had so many complaints about people that this is offensive . . . . You're free to stay here, whatever, but we can't have these type of signs up where people can see 'em.

**Lefemine**: We will leave if you're ordering us to leave under threat of being ticked or being arrested . . . . Being offensive is not a basis for violating First Amendment rights. . . .

> **Major Smith**: You do not have a right to be offensive to other people in that manner.
> . . . .
>
> **Major Smith**: . . . I"m asking you if you will please take the signs down. If you do not take the signs down we will have no other choice we're gonna ticket you for breach of peace.
>
> **Lefemine**: . . . . These are not obscene signs.
> . . . .
>
> **Major Smith**: And I'm not saying you gotta leave the sidewalk. I'm not sayin' that. I'm just sayin' you got to put these signs down.
> . . . .
>
> **Major Smith**: Like I said, this is the last warning. You can either go ahead and put 'em down or [I'll] ticket you.
>
> **Lefemine** (to others in the group): Go ahead and remove the signs, he's violating our constitutional rights. Go remove the signs. . . remove the signs.

(Id. Attach. 3 (Transcript).) Following the conversation with Major Smith, Plaintiff and the other members of the CCL "packed up their signs and left shortly thereafter." (Am. Compl. ¶ 35.)

On November 13, 2006, an attorney from the National Legal Foundation ("NLF") wrote a letter to Sheriff Dan Wideman ("Sheriff Wideman") of Greenwood County to inform Sheriff Wideman that "CCL volunteers will be returning to the Greenwood area in the near future to exercise their First Amendment freedoms by highlighting the national tragedy of abortion." (Pl. Mem. Supp. Summ. J. Ex. 5 (Nov. 13, 2006 Letter to Sheriff).) The letter continued to state that Sheriff Wideman was "hereby put on notice that any further interference with CCL's message by you or your officers will leave us no choice but to pursue all available legal remedies without further notice." (Id. Ex. 5 (Nov. 13, 2006 Letter to Sheriff).) The NLF lawyers also

mailed the same letter to Chief of Police Gerald Brooks ("Chief Brooks") of the City of Greenwood Police Department. (Id. Ex. 6 (Nov. 13, 2006 Letter to Police Dept.).)

On November 17, 2006, Chief Brooks responded to the NLF's letter stating that CCL was welcome to visit the community and exercise their rights as there are "many public places where CCL can park, assemble, and convey their message." (Id. Ex. 7 (Nov. 17, 2006 Letter).) On November 28, 2006, Chief Deputy Frederick responded to the NLF stating, in part, that Major Smith's response in 2005 was based on CCL's methodology not their content and "should we observe any protester or demonstrator committing the same act, we will again conduct ourselves in exactly the same manner: order the person(s) to stop or face criminal sanctions." (Id. Ex. 8 (Nov. 28, 2006 Letter).) On November 25, 2006, Plaintiff "and others held their pro-life demonstration on the Greenwood city side of U.S. 25/S.C. 72 Bypass for fear of criminal sanctions from Greenwood County." (Am. Compl. ¶ 40.) No problems occurred during this demonstration.

CCL held another pro-life demonstration in 2007 "on the Greenwood city side of U.S. 25/S.C. 72 Bypass for fear of criminal sanctions from Greenwood County." (Id. ¶ 42.) Plaintiff currently desires to conduct a "Show the Truth Tour" in Greenwood County but alleges that he fears criminal prosecution. (Id. ¶¶ 43-44.)

Plaintiff filed a complaint against Sheriff Wideman, former Chief Deputy Frederick, Major Smith, and Deputy Strickland on October 31, 2008, alleging violations of his First Amendment rights. On February 27, 2009, Plaintiff filed an amended complaint adding Sheriff Tony Davis ("Sheriff Davis") as a Defendant. On April 5, 2010, Sheriff Davis, Major Smith, Deputy Strickland, and Sheriff Wideman filed a motion for summary judgment. On the same

day, Plaintiff filed a motion for summary judgment. On April 9, 2010, former Chief Deputy Frederick filed a motion for summary judgment. Sheriff Davis, Major Smith, Deputy Strickland, and Sheriff Wideman filed a memorandum in opposition of Plaintiff's motion for summary judgment on April 22, 2010. On the same day, Plaintiff filed a memorandum in opposition of Defendants' motion for summary judgment. Former Chief Deputy Frederick filed a memorandum in opposition to Plaintiff's motion for summary judgment on April 26, 2010. On the same day, Plaintiff filed a memorandum in opposition to Chief Deputy Frederick's motion for summary judgment. Plaintiff filed replies to Defendants' motions for summary judgment on May 3, 2010 and May 7, 2010. A hearing was held on the cross motions for summary judgment on June 23, 2010. This matter is now ripe for consideration.

## II. Discussion of the Law

### A. Summary Judgment Standard

Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Rule 56(c) mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248.

Moreover, "[w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

### B. Cross Motions for Summary Judgment

Plaintiff argues that his speech is "chilled and he is deterred from demonstrating with the graphic abortion signs in Greenwood County because he fears criminal prosecution for his message." (Am. Compl. ¶ 44.) Accordingly, Plaintiff brings this action under 42 U.S.C. § 1983 seeking damages, injunctive and declaratory relief for the violation of his rights of free speech, peaceable assembly, and the free exercise of religion. (Id., generally.)

Plaintiff argues that he is entitled to summary judgment because Defendants' restrictions on his speech were based on the content of his message. (Pl. Mem. Supp. Summ. J. 7.) Defendants argue that they are entitled to summary judgment because Plaintiff cannot show a violation of his federally protected rights. (Defs. Mem. Supp. Summ. J., generally); (Chief Deputy Frederick Mem. Supp. Summ. J., generally.) Specifically, Defendants argue that their restrictions on CCL's speech constituted a reasonable time, place, and manner restriction and they "*could* lawfully sanction or threaten sanctions for violation of any lawfully imposed restrictions." (Defs. Mem. Supp. Summ. J. 13.) Defendants also argue that they are entitled to qualified immunity. (Defs. Mem. Supp. Summ. J., generally); (Chief Deputy Frederick Mem. Supp. Summ. J., generally.)

## 1. Freedom of Speech and Assembly

The First Amendment of the United States Constitution protects an individual's right to freedom of expression through speech and public assembly. Virginia v. Black, 538 U.S. 343, 358 (2003); Nat'l Socialist White People's Party v. Ringers, 476 F.2d 1010, 1016 (4th Cir. 1973). "The protections afforded by the First Amendment, however, are not absolute, and . . . the government may regulate certain categories of expression consistent with the Constitution." Id. "The right to use government property for one's private expression depends upon whether the property has by law or tradition been given the status of a public forum, or rather has been reserved for specific official uses." Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 761 (1995). In traditional public forums, such as streets, public sidewalks, and parks, "a State's right to limit protected expressive activity is sharply circumscribed: It may impose reasonable, content-neutral time, place, and manner restrictions . . . , but it may regulate expressive content only if such a restriction is necessary, and narrowly drawn, to serve a compelling state interest." Id.

It is undisputed that CCL's November 3, 2005 demonstration took place within a traditional public forum. As such, Defendants could not impose a content-based restriction on CCL's speech unless the "restriction [wa]s necessary to serve a compelling state interest and . . . [wa]s narrowly drawn to achieve that end." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983).

Plaintiff asserts that Defendants' "demand that CCL put down only the graphic Signs was a content-based restriction" improperly based on "the reaction of the public." (Pl. Mem. Supp. Summ. J. 9, 11.) Specifically, Plaintiff contends that

8

> [in his dialogue at the intersection,] Major Smith did not say that CCL was too close to the road, obstructing traffic, impeding lines of sight for drivers. Such at least facially content-neutral statements would have presumably prompted a different type of request from the Sheriff–ranging from a request to move back from the road several feet or to a specified intersection to the use of smaller signs. Further, the request would have been as to all CCL's signs and not simply the Signs the Sheriff and the two citizens disfavored. Instead the demand from the Sheriff simply reinforces its improper regard for the content of the Signs– notably, its only demand was that the Signs be put down or a citation would [be] issue[d]. The problem for the Sheriff was not the size or location of any signs; it was the existence of *the* Signs, the ones depicting aborted babies, a patently content-based demand.

(Id. at 17 (footnote omitted).) Defendants argue, however, that they

> did not base their action on disagreement with [Plaintiff's] viewpoint or otherwise on the content of the speech, but rather on the harmful effects of the *method* [Plaintiff] used . . . . [D]efendants' actions, which were limited to ordering [Plaintiff] to remove the graphic signs and threatening to ticket him if he did not, were directed at the breach of the peace–not at the protestors' viewpoint. . . . [D]efendants' actions, therefore, were not based on the content of [Plaintiff's] message, on disagreement with his beliefs or opinions, but rather, on the fact that extremely graphic representations were disturbing motorists and causing traffic issues.

(Defs. Mem. Supp. Summ. J. 15.)

Upon review of the totality of the evidence within the record, the court finds that Defendants' restriction on Plaintiff's speech was content-based. While Defendants contend that their restriction is content-neutral because it was not motivated by disapproval or disagreement with Plaintiff's pro-life stance, this argument confuses *viewpoint* neutrality with *content* neutrality. The United States Supreme Court has consistently "rejected the argument that viewpointneutrality equals contentneutrality." Capital Area Right to Life, Inc. v. Downtown Frankfort, Inc., 511 U.S. 1135, 1135 (1994) (O'Connor, J., dissenting) (citing cases); see e.g., Boos v. Barry, 485 U.S. 312, 319-20 (1988) (explaining that while a restriction is viewpoint

9

neutral that "does not render [it] content neutral"). "[C]ontent-neutral speech restrictions . . . are *justified* without reference to the content of the regulated speech." Boos, 485 U.S. at 320 (internal quotation marks omitted). The restriction imposed upon Plaintiff's speech was motivated solely based upon the content of the graphic signs.[1] As such, Defendants' restriction was content-based. See World Wide Street Preachers' Fellowship v. City of Owensboro, 342 F. Supp. 2d 634, 641 (W.D. Ky. 2004) (finding government restriction on graphic anti-abortion sign content-based); United States v. Marcavage, No. 09-3573, 2010 WL 2384839, at *14 (3d Cir. June 16, 2010) (finding government restriction on graphic anti-abortion sign content-based).

Content-based restrictions on speech "are presumptively invalid and subject to strict scrutiny." Ysursa v. Pocatello Educ. Ass'n, 129 S. Ct. 1093, 1098 (2009) (internal quotation marks omitted). Therefore, Defendants' restriction on Plaintiff's speech must (1) serve a compelling state interest *and* (2) be narrowly drawn to achieve that end. Perry Educ. Ass'n, 460 U.S. at 45. In World Wide Street Preachers' Fellowship, 342 F. Supp. 2d at 637, the court reviewed whether a content-based ban on a graphic anti-abortion sign survived strict scrutiny. In World Wide, the city prohibited an evangelical group from displaying a large sign containing an enlarged photograph of a mutilated fetus. Id. at 636. The city argued, in part, that protecting young children was a compelling government interest justifying the ban. Id. at 640-41. The court concluded that assuming protecting children from these images was a compelling state interest, the defendants' blanket ban on the sign was not narrowly tailored. Id. at 641. The court explained, while the government "is not required to employ the least restrictive means

---

[1] CCL members also carried large textual signs, some of which were larger than the graphic posters, that were not banned by Defendants. See (Defs. Mem. Supp. Summ. J. Attach. 12 (Officer Strickland Aff., pictures attached).). As such, it does not appear that neutral aspects, such as the size of the posters, was the motivating force behind the ban on the graphic posters.

conceivable . . . [i]t must, however, demonstrate narrow tailoring of the challenged regulation to the asserted interest–a fit that is not necessarily perfect, but reasonable." Id. (internal quotation marks and citation omitted). Ultimately, the court concluded that

> the City of Owensboro [could not] show that its actions were narrowly drawn to achieve that compelling state interest. The City made no attempt to establish any type of "fit" between its interest of protecting children and the street preachers' interest in exercising free speech. While depriving the Plaintiffs of the sign enabled the City of Owensboro to attain its compelling state interest, the means employed did not account in any way for a less restrictive alternative that would enable the street preachers to exercise their right to free speech. Completely banning the signs is not narrow tailoring.
>
> Also problematic, as the Plaintiffs point out, is the City's reliance that the images are too "graphic." Who decides when an image is too "graphic?" Is it the police or the heckler? In either case, the term is too vague to be constitutional. As such, the City of Owensboro's actions are unconstitutional.

Id.

Here, Defendants allege that their concerns for traffic safety and protecting young children served as compelling interests for preventing a breach of the peace and requiring Plaintiff and CCL members to take down all graphic signs. Specifically, Defendants contend that

> the following factors [created a breach of the peace]: (1) the signs were gruesome, gory, graphic, in full color, and large; (2) the intersection at which the signs were being displayed was the busiest intersection in Greenwood County, and the signs were being displayed at a time and in such a manner as to interfere with traffic; (3) the protestors were positioning the signs along the sidewalk in such a way that motorists would not be able to both avoid looking at them and drive safely; and (4) parents with children in the car would not be able to shield the children from the images. In other words, the protesters, were forcing unwilling recipients to view the offensive images on their signs, and more importantly, were depriving parents of the ability to shield their children from images that could be harmful to them.

(Defs. Mem. Supp. Summ. J. 16-17.) Despite Defendants' argument that traffic safety was a compelling interest, in his conversation with Plaintiff, Major Smith did not mention traffic safety as his reason for wanting the graphic signs down. The record evidences that two citizens made

complaints; however, neither complaint stated that the signs were interfering with traffic.[2]  See (Defs. Mem. Supp. Summ. J. Attach. 2 (Incident Report).).  The only mention of disturbance of traffic is found in the incident report written by Lt. Miles.  The incident report states that when Lt. Miles arrived on the scene, he

> talked to STEVE LEFEMINE.  He told me he was leading the protest for the organization [CCL].  I told Mr. Lefemine that the Sheriff's Dept. has had several complaints about the graphic photographs and this was causing a disturbance in the traffic flow at the intersection.  I told Mr. Lefemine that he would have to quit using the blow horn while showing the photographs because it was disturbing people and upsetting traffic flow.

(Id. Attach. 2 (Incident Report).)  The record is devoid, however, of any evidence of car accidents, unusual or dangerous congestion, or any similar traffic concerns.  As such, the court finds that traffic safety, under the facts of this case, was not a compelling interest to justify Defendants' restriction.

Defendants also argue that protecting young children from viewing graphic pictures was a compelling state interest that justifies their ban on the graphic pictures.  One parent complained that her child saw one of the graphic signs and became frightened.  (Defs. Mem. Supp. Summ. J. Attach. 2 (Incident Report).)  In his conversation with Plaintiff, Major Smith explained that the signs were offensive because "small children" may see the signs.  (Id. Attach. 3 (Transcript).) The court agrees that protecting children may be a compelling interest.  However, strict scrutiny requires a two-step analysis.  Once a compelling government interest is shown, the court must

---

[2] According to the incident report, Keith Fisher informed Lt. Miles "that when he was traveling through the intersection he saw several people standing on the corners holding and carrying large posters of graphic photographs of aborted fetuses." (Defs. Mem. Supp. Summ. J. Attach. 2 (Incident Report).) Another complainant, Patience Payne, complained that her five-year-old-son saw one of the graphic signs and became "frightened and upset." (Id. Attach. 2 (Incident Report).)

12

then determine whether the government's restriction was *narrowly* tailored to meet that compelling interest. Perry, 460 U.S. at 45.

Similar to the defendants in World Wide Street Preachers' Fellowship, Defendants restricted Plaintiff's speech by banning all graphic signs. 342 F. Supp. 2d at 636. Plaintiff, therefore, was faced with the choice of either taking down all of the graphic signs or receiving a citation for breach of the peace. Such a blanket ban, under the facts of this case, does not constitute narrow tailoring. Defendants made no attempt to satisfy its interest, protecting children from seeing the signs from the main road, without completely banning Plaintiff's right to communicate a message utilizing the signs. Rather, Defendants' sole motivation was to completely ban all of the graphic signs which they clearly found to be "offensive." (Defs. Mem. Supp. Summ. J. Attach. 3 (Transcript).) The United States Supreme Court has "consistently stressed that we are often captives outside the sanctuary of the home and subject to objectionable speech." Cohen v. California, 403 U.S. 15, 21 (1971) (internal quotation marks omitted). Accordingly, the court finds that Defendants did not narrowly tailor its restriction to achieve its interest in protecting children. As such, Defendants' restriction of Plaintiff's speech on November 3, 2005, was unconstitutional. See e.g., Frye v. Kansas City Missouri Police Dep't, 375 F.3d 785, 792 (8th Cir. 2004) (finding government restriction on graphic abortion sign constitutional because officers narrowly tailored the restriction by allowing graphic signs to be displayed at a location further from the road.)

Based on the foregoing, the court grants Plaintiff's motion for summary judgment as to the freedom of speech and assembly claims.

## 2. Free Exercise of Religion

Plaintiff also seeks summary judgment on his free exercise of religion claim. Plaintiff asserts that "[i]n the exercise of [his] religious beliefs, CCL either displays or supervises the display of pro-life signs in Greenwood County." (Am. Compl. ¶ 57.) Therefore, "[a]s a direct and proximate result of the Sheriff's actions and policies, Mr. Lefemine's speech is chilled, and he is deterred from freely exercising constitutionally protected religion." (Id. ¶ 59.) Plaintiff alleges that Defendants' "threat of arrest or ticketing clearly forced [him] to 'modify his behavior' and thereby 'violate his beliefs.'" (Pl. Mem. Supp. Summ. J. 18.)

"The Free Exercise Clause of the First Amendment, applicable to the states through the Fourteenth Amendment, forbids the adoption of laws designed to suppress religious beliefs or practices unless justified by a compelling governmental interest and narrowly tailored to meet that interest." Booth v. Maryland, 327 F.3d 377, 380 (4th Cir. 2003). Likewise, the government, through its actions, may not suppress religious beliefs absent a compelling governmental interest and narrow tailoring.

"The Free Exercise Clause, however, does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." Id. (internal quotation marks omitted). However, as discussed above, Defendants' prohibition of the graphic signs was not neutral and therefore must survive strict scrutiny. For the reasons discussed above, the court finds that Defendants' prohibition upon Plaintiff was not narrowly tailored to meet its interest. Defendants' prohibition was not narrowly tailored in order to balance meeting the government's

interest in protecting children with Plaintiff's right to freely express his religious beliefs.[3] Therefore, the court grants Plaintiff's motion for summary judgment as to his free exercise of religion claim.

### 3. Qualified Immunity

#### a. Individual Capacity

Defendants allege that they are entitled to qualified immunity because there was no clearly established law indicating that their conduct would violate Plaintiff's constitutional rights. (Defs. Mem. Supp. Summ. J. 23.); (Chief Deputy Frederick Mem. Supp. Summ. J., generally.) "[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 614 (1999) (internal quotation marks omitted).

> What this means in practice is that whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.

Id. (internal quotation marks omitted).

> [C]learly established for purposes of qualified immunity means that [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously

---

[3] The court acknowledges that the free exercise of religion "embraces two concepts,– freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." Cantwell v. State of Connecticut, 310 U.S. 296, 303-04 (1940). However, for the reasons explained in the free speech analysis above, the court concludes that Defendants' blanket ban on Plaintiff's use of graphic pictures was not narrowly tailored.

15

> been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Id. at 614-15 (internal quotation marks omitted).

In Saucier v. Katz, 533 U.S. 194, 201 (2001), the United States Supreme Court established a "two-step sequence for resolving government officials' qualified immunity claims." Pearson v. Callahan, 129 S. Ct. 808, 815 (U.S. 2009). "First, a court [has to] decide whether the facts that a plaintiff . . . allege[s] . . . [set] out a violation of a constitutional right. Second, if the plaintiff . . . satisfie[s] this first step, the court . . . decide[s] whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Id. at 815-16 (internal citations omitted). In Pearson, however, the United States Supreme Court held that "while the [Saucier test] is often appropriate, it should no longer be regarded as mandatory." Id. at 818. "The judges of the district courts . . . should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id. Thus, Pearson "does not prevent the lower courts from following the Saucier procedure; it simply recognizes that those courts should have the discretion to decide whether that procedure is worthwhile in particular cases." Id. at 821.

The court finds that the Saucier procedure is worthwhile in the instant case particularly because the first prong has been satisfied. As discussed above, Defendants violated Plaintiff's constitutional right to free speech in a traditional public forum. The question now becomes whether a reasonable officer could have believed that prohibiting demonstrators from displaying

large signs containing pictures of dismembered, aborted fetuses at a major intersection was lawful, in light of clearly established First Amendment law and the information they possessed.

In November 2005, there was no clearly established law provided by the United States Court of Appeals for the Fourth Circuit regarding the extent to which government officials may proscribe the use of photographs of aborted fetuses in a traditional public forum. "[R]eliance on decisions from other circuits to determine that a given proposition of law is clearly established is inappropriate as a general matter." Wilson v. Layne, 141 F.3d 111, 117 (4th Cir. 1998). While it was clearly established that individuals have a right to freely express their views in a traditional public forum such as sidewalks, that is not enough. "[T]he right the official is alleged to have violated must have been clearly established in a more particularized, and hence more relevant, sense." Saucier, 533 U.S. at 202 (internal quotation marks omitted). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id.

The court finds that, under the specific facts of this case, it was not unreasonable for Defendants to believe that their prohibition was lawful. After arriving at the intersection, Major Smith called his superior, Chief Deputy Frederick, now former Chief Deputy Frederick, to describe what was taking place. After speaking with Major Smith, Chief Deputy Frederick advised Major Smith that "the disturbance could be addressed as a breach of the peace based on the combination of the graphic nature of the signs and their proximity to the road, and that, in keeping with the law, he could order the protestors to stop waving the graphic signs; he further directed [Major] Smith to have the signs removed from areas visible from the roadway." (Defs. Mem. Supp. Summ. J. 3.); (Id. Attach. 6 (Chief Deputy Frederick Dep. 40-44).) Chief Deputy

Frederick explained that based on "various constitutional law classes [he's] had, FBI Academy and in-service type training" he believed that he had a duty to "protect the public from what we see as, for example, roadway hazards, distracted motorists, et cetera. And that in this particular instance, [he] made the judgment that the danger to the motorist outweighed their right to stand six inches from the roadway and conduct themselves as they were." (Chief Deputy Frederick Mem. Supp. Summ. J. Add'l Attach. 4 (Chief Deputy Frederick Dep. 26-27).)

At the instruction of Chief Deputy Frederick, Major Smith spoke with Plaintiff about removing the graphic signs while Officer Strickland took pictures at the scene. As counsel for Plaintiff and Defendants stated during the hearing on the cross motions for summary judgment, Major Smith and Officer Strickland behaved professionally and courteously at all times during their interaction with Plaintiff and members of CCL. When faced with fulfilling its obligation to protect citizens on the roadways without infringing upon the free speech rights of Plaintiff, Defendants' decision to prohibit the graphic signs, while ultimately failing to survive scrutiny, was not unreasonable under the circumstances. "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law. This accommodation for reasonable error exists because officials should not err always on the side of caution because they fear being sued." Hunter v. Bryant, 502 U.S. 224, 229 (1991) (internal citation and quotation marks omitted). Accordingly, Defendants are immune from suit in their individual capacity.[4]

---

[4] Defendant Sheriff Davis is sued only in his official capacity.

### b. Official Capacity

Plaintiff also brings suit against Defendants in their official capacity. "Official-capacity suits . . . generally represent . . . another way of pleading an action against an entity of which an officer is an agent." Kentucky v. Graham, 473 U.S. 159, 165 (1985) (internal quotation marks omitted). As such, Plaintiff's claims against Defendants in their official capacity are merely claims against the Greenwood County Sheriff's Office ("Sheriff's Office"). Sheriff Wideman "was the Greenwood County Sheriff at all times pertinent to the specific events alleged within this First Amendment Complaint. In his official capacity, he was responsible for enforcement of Greenwood County's laws, ordinances, and policies." (Am. Compl. ¶ 12.) "To hold [the Sheriff's Office] liable for a single decision (or violation), the decisionmaker must possess final authority to establish municipal policy with respect to the action ordered." Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004) (internal quotation marks omitted).

The Sheriff's Office cannot be held liable pursuant to respondeat superior for the constitutional violations of their employees. Monell v. Dep't of Social Services of City of New York, 436 U.S. 658, 692-94 (1978). Instead, "it is when execution of a government's policy or custom, . . . inflicts the injury that the government as an entity is responsible." Id. at 694. Plaintiff has not sufficiently pled facts to support the conclusion that it is the policy or custom of the Sheriff's Office to violate a citizen's First Amendment rights. Further, Plaintiff has not shown a policy or custom of the Sheriff's Office to utilize breach of the peace violations as a way to infringe upon a citizen's First Amendment rights. As such, Defendants are immune from suit in their official capacity. Therefore, Plaintiff is not entitled to monetary damages.

### 4. Attorney's Fees

Pursuant to 42 U.S.C. § 1988(b), a prevailing party in a § 1983 action may, in the court's discretion, receive attorney's fees. Under the totality of the facts in this case the award of attorney's fees is not warranted.

Therefore, it is

**ORDERED** that Defendants' motions for summary judgment, docket numbers 41 and 46, are granted in part and denied in part; it is further

**ORDERED** that Plaintiff's motion for summary judgment, docket number 42, is granted in part and denied in part; it is further

**ORDERED** that Plaintiff's request for attorney's fees is denied; and it is further

**ORDERED** that Defendants are enjoined from engaging in content-based restrictions on Plaintiff's display of graphic signs without narrowly tailoring its restriction to serve a compelling state interest.

**IT IS SO ORDERED.**

s/Henry M. Herlong, Jr.
Senior United States District Judge

Greenville, South Carolina
July 8, 2010